IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

BLACK BUSINESS
INVESTMENT FUND OF
CENTRAL FLORIDA, INC.,

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

      Appellant,

CASE NO. 1D14-3971

v.

STATE OF FLORIDA,
DEPARTMENT OF ECONOMIC
OPPORTUNITY,

      Appellee.

_____/

Opinion filed November 9, 2015.

An appeal from the Circuit Court for Leon County.
Kevin J. Carroll, Judge.

Henry G. Gyden of Gyden Law Group, Tampa, for Appellant.

Robert N. Sechen, General Counsel, Stephen S. Everett, Assistant General Counsel, State of Florida, Department of Economic Opportunity, Tallahassee, for Appellee.

THOMAS, J.

      This appeal comes to us on the trial court's entry of a summary judgment against Appellant in favor of Appellee, State of Florida, Department of Economic Opportunity (the Agency), with respect to the Agency's claims of breach of

contract and conversion, and the trial court's denial of Appellant's motion for summary judgment. Appellant contends that the trial court erred in its interpretation of both the contract Appellant entered into with the Agency's predecessor and with section 288.1081(5)(d), Florida Statutes (2009). Appellant further argues that the trial court erred by finding that its affirmative defenses and counterclaims were barred by either the contract or by sovereign immunity. Appellant also appeals the trial court's determination of the start date for purposes of calculating prejudgment interest.[1] As discussed below, we affirm the trial court's order denying Appellant's motion for summary judgment in all respects, except for the award of pre-judgment interest effective July 1, 2011.

Factual Background

In response to the economic crisis prevailing in 2009, the Legislature enacted the "Economic Gardening Business Loan Pilot Program" (EGBLPP) and allocated $8.5 million to provide low-interest loans to small businesses around the state. In relevant part, the enacting statute provided:

> A loan administrator is entitled to receive a loan origination fee, payable at closing, of 1 percent of each loan issued by the loan administrator **and a servicing fee of 0.625 percent per annum of the loan's outstanding principal balance, payable monthly**. During the first 12 months of the loan, the servicing fee shall be paid from the disbursement from the Economic Development Trust Fund, and thereafter the loan administrator shall collect the servicing fee from

---

[1] Appellant's appeal of this judgment was assigned case number 1D15-302. By order of this court, both appeals were consolidated for all purposes.

the payments made by the borrower, charging the fee against repayments of principal.

§ 288.1081(5)(d), Fla. Stat. (2009) (footnote omitted) (emphasis added).

Appellant was chosen by Appellee's predecessor agency[2] to administer EGBLPP. In relevant part, the contract between the parties provided:

Section 2 –Scope of Work
GRANTEE shall be entitled to receive loan origination fee, payable at closing of one percent (1%) of each loan issued by GRANTEE **and a monthly servicing fee of 0.625 percent per year of the loan's outstanding principal balance, payable monthly**.

(Emphasis added.)

After the contract was signed in August 2009, Appellant began making loans and deducting its monthly servicing fee of 0.625% of the outstanding principal balance of each loan. Eventually, the Agency informed Appellant that the fee was payable at an annual rate of 0.625%, payable in twelve monthly installments (or 0.052%). The Agency demanded that Appellant return all fees retained in excess of approximately $49,000 and any funds not loaned or subject to a loan agreement reached by June 30, 2011.

The Agency filed a breach of contract and conversion complaint after Appellant failed to comply with this demand. Appellant responded by denying any breach or conversion, arguing that its interpretation of how to calculate the fee was correct, and asserting various affirmative defenses and filing a counterclaim for,

---

[2] The Office of Tourism, Trade, and Economic Development ("OTTED").

3

*inter alia*, equitable relief.

Both parties moved for summary judgment, and the trial court agreed with the Agency's interpretation of the statute and contract, and found that Appellant's equity claims were barred by either the contract or sovereign immunity. The court awarded damages of nearly $500,000 on the breach of contract action, and nearly $600,000 for the conversion claim. The court also awarded interest, including pre-judgment interest. The court found that the pre-judgment interest award was to run from July 1, 2011, the date after which no new loans were allowed pursuant to section 288.1081(9), and which also provided that any unexpended funds as of that date were to revert to the State.

Analysis

*Summary Judgment - Estoppel*

"Summary judgment is proper if there is no genuine issue of material fact and if the moving party is entitled to a judgment as a matter of law. Thus, our standard of review is de novo." Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126, 130 (Fla. 2000) (citation omitted).

We agree with the trial court that both the statute and the contract provide for an annual servicing fee of 0.625%, payable in twelve monthly installments. Although a committee report and staff analysis concerning the loan program clearly stated that loan administrators for the program were to be paid a servicing

4

fee of 0.625% per month, the final version of the bill signed into law provided for an annual fee of 0.625% rather than a monthly fee in that amount.[3] How this came to be is pure speculation, but, as the trial court found, the statute is not ambiguous; thus, this court cannot deviate from the plain text. See Daniels v. Fla. Dep't of Health, 898 So. 2d 61, 64 (Fla. 2005) ("When the statute is clear and unambiguous, courts will not look behind the statute's plain language for legislative intent or resort to rules of statutory construction to ascertain intent."). Likewise, because the contract language is substantially similar to that of the statute it was intended to implement, the same result is required.

We note, however, that confusion regarding the correct calculation of the servicing fee was understandable in light of various actions by OTTED and the Agency. This confusion, however, did not rise to the level necessary to establish a claim for equitable estoppel. See Hoffman v. State, Dep't of Mgmt. Servs., Div. of Ret., 964 So. 2d 163, 166 (Fla. 1st DCA 2007).

In order to demonstrate estoppel, Appellant must show that: (1) the Agency represented a material fact contrary to its later asserted position; (2) Appellant relied on the Agency's earlier representation; and (3) Appellant changed its

---

[3] In fact, in his presentation in support of the program, the then-director of the OTTED explained that the plan included a provision for a third-party loan administrator that would be compensated with a "1% administration fee, plus 0.625 percent monthly servicing fee." [sic].

5

position, to its detriment, due to the Agency's representation and its reliance thereon. See Hoffman, 964 So. 2d at 166.

Here, the Agency's insistence that both it and the OTTED have consistently construed both the contract and the statutory language to provide for an annual fee of 0.625% is not supported by the record. For example, in August 2010, an internal "transition" memorandum explained that the loan administrator was entitled to a 1% origination fee "and a monthly servicing fee of 0.625% of the loans [sic] outstanding balance." Another internal memorandum, this one generated as late as July 2012, acknowledged an audit was performed in mid-2010 which included a review of invoices Appellant submitted and showed that Appellant was charging fee amounts consistent with a 0.625% monthly fee, and that the Agency did not object. But, fatal to Appellant's argument, there is no evidence that either the Agency or OTTED explicitly represented to Appellant that the fee was calculated at the monthly rate of 0.625%. At most, Appellant relies on an ambiguous email from the Agency's contract administrator which, in response to an equally ambiguous inquiry, replied that the fee was payable as provided by the contract and statute.

We acknowledge that Appellant's contractual duties extended beyond simple loan servicing, a fact the Agency has also acknowledged. The contract specifically referred to the business plan Appellant submitted as part of its

6

application to administer the program, which required that Appellant use the loan funds consistent with the purposes of the program "as outlined in the business plan." In that plan, Appellant indicated that it would provide a variety of services to promote and effectuate the program's goals, including providing financial and technical assistance, education, business development services, workshops, buying newspaper advertisements, and participation in business trade shows. Also, in its October 2009 monthly update, Appellant informed the Agency that Appellant had developed a website "with program information & application download," and that Appellant had contracted "for the development of EGL program lending policies and guideline procedures."

The Agency's position is that Appellant was to provide all of these services *and* service over $8 million in loans in exchange for a $1,000 origination fee and an annual fee of 0.625% of the principal balance for each loan. The Agency contends that this was adequate for Appellant to "recover its costs," despite being informed by the only other entity that the Agency chose to administer the program that this compensation was not sufficient, because the costs associated with loan closures were also included in that fee.

Despite this, according to the Agency's calculations, Appellant was entitled to a servicing fee of less than $50,000 to recover its costs for providing all of the aforementioned services during the first year of the program. But the Agency did

7

not tell Appellant about this calculation on April 10, 2012, just three days after Appellant informed the Agency that "for the first year of the program, the total expense was approximately $463,828.67 of which $333,918.30 was billed leaving an uncollected balance of $129,910.37."

Thus, while it may be understandable that Appellant erroneously assumed it was entitled to a monthly servicing fee of 0.625%, "[e]quitable estoppel is applied against a state agency only in exceptional circumstances and must include some positive act on the part of a state officer upon which Appellant had a right to rely and did rely to her detriment." Hoffman, 964 So. 2d at 166. Here, although the Agency enjoyed the multitude of services Appellant provided for what turned out to be a fee insufficient to cover its costs, and failed to inform Appellant of its mistake regarding the fee amount it had been collecting after the Agency received its mid-2010 audit, this inaction did not rise to the level of a positive act required to expose the Agency to potential liability under the equitable estoppel doctrine.

Therefore, under Article II, section three, of the Florida Constitution, we are constrained to affirm the trial court's summary judgment as to the substantive issues raised, regardless of whether we find that the clear statutory text providing for an annual fee of 0.625% is either fair or equitable, as that decision is solely within the Legislature's domain. See e.g., Pepper v. Pepper, 66 So. 2d 280, 284 (Fla. 1953) (holding "[f]or the Judicial Department of the Government to attempt

8

. . . to amend or modify an Act of the Legislature would constitute an unlawful encroachment by the Judiciary on the Legislative powers . . . .").   This leaves, therefore, the issue of when prejudgment interest began to accrue.

*Prejudgment Interest*

A trial court's decision concerning entitlement to prejudgment interest is reviewed *de novo*.  Berloni S.P.A. v. Della Casa, LLC, 972 So. 2d 1007, 1011 (Fla. 4th DCA 2008).  The trial court found for the Agency on its conversion claim, finding that, pursuant to section 288.1081(9), Appellant was no longer authorized to make any loans or enter into any loan agreements after June 30, 2011, and any unexpended funds were to revert to the state's general revenue fund.

Section 288.1081(9), Florida Statutes (2009), provides:

Unexpended balances of appropriations provided for the pilot program shall not revert to the fund from which the appropriation was made at the end of the fiscal year but shall be retained in the Economic Development Trust Fund and be carried forward for expenditure for the pilot program during the following fiscal year. A loan administrator may not award a new loan or enter into a loan agreement after June 30, 2011. **Balances of appropriations provided for the pilot program which remain unexpended as of July 1, 2011, shall revert to the General Revenue Fund.**

(Emphasis added.)

The applicable portion of the parties' contract provides that

following termination of this Agreement, all funds which as of that date were previously provided by [Appellee] and not expended by GRANTEE shall revert to the State of Florida General Revenue Fund. **The requirement for the return or/and method of repayment of**

9

**any remaining funds shall be at the sole discretion of [Appellee]**. Further, [Appellee] may recover the Funds awarded to GRANTEE by payment of the amount from GRANTEE [i]n total, or, if all of the Funds have been disbursed, by collection of loan payments or investment returns as the loans or investments mature (that is, [Appellee] and not GRANTEE shall be entitled to collect the receivables, subject to any rights of others).

(Emphasis added.)

The plain language of the statute provides for a deadline after which no further loans are authorized and designates where any unexpended funds "shall" go (the General Revenue Fund) after that date (i.e., a future action). As the trial court found, the statute does not indicate that unexpended funds are deemed to be automatically allocated as of July 1, 2011. Rather, the statute provides for the ultimate destination of any unexpended funds once returned. Thus, for purposes of determining the actual date on which entitlement to prejudgment interest begins, this statute is not dispositive.

The parties' contract provision quoted above, however, is relevant to this determination. As with the statute, the contract provides that funds unexpended as of the contract's termination are to revert, but the contract also provides the Agency with discretion as to whether repayment is required, and how repayment is to be accomplished. Thus, before Appellant became liable for repayment, some communication from the Agency was necessary informing Appellant that the contract was terminated (whether because of a breach or because of the passing of

10

the statutory deadline), repayment was required, how much repayment was due, and how to transfer the funds.

Notably, in its April 10, 2012, demand letter, the Agency tracked the contract's language, informing Appellant that it was "requiring repayment of $575,781.25 that [Appellant] is holding in reserve." In its sole reference to the statute, the Agency notes only that no loans or loan agreements were allowable after June 30, 2011. The letter does not state that Appellant must return the funds on July 1, 2011; rather, in addition to acknowledging that it was aware that Appellant was holding the funds in reserve, Appellee demanded repayment within fourteen days, and instructed that "[p]ayment shall be made by check or money order . . . ." That is, as per the contract, it informed Appellant of the method of repayment.

A conversion claim is based on a "'positive, overt act or acts of dominion or authority over the money or property inconsistent with and adverse to the rights of the true owner.'" Columbia Bank v. Turbeville, 143 So. 3d 964, 969 (Fla. 1st DCA 2014) (quoting S.S. Jacobs Co. v. Weyrick, 164 So. 2d 246, 250 (Fla. 1st DCA 1964). In Turbeville, this court held that a bank's allegations were sufficient to allege conversion when the bank pled that the defendant "intentionally engaged in unauthorized conduct when she (a) withdrew funds from the accounts at issue" depriving Ms. Pueschel of her 'immediate right to possess the funds' and (b) failed

11

to return the funds upon *demand*." Id. (emphasis added). Generally, before a conversion can occur, a party that was previously in rightful possession of another party's funds must be informed by the other party that: 1) continued possession of the funds is no longer permitted; 2) a demand for return of the funds is necessary; and 3) the party holding the funds must fail to comply with the demand.

Here, as noted, the Agency's demand letter at least implicitly acknowledged that Appellant's retention of the funds at issue after July 1, 2011, was consensual, when the Agency addressed Appellant's retention of the funds in its reserves. The Agency did not assert that Appellant's possession of those funds after that date was in any way improper.

The Agency relies on Lumbermens Mutual Casualty Co. v. Percefull, 653 So. 2d 389 (Fla. 1995), for the proposition that the type of action upon which the prevailing party obtains judgment determines when the award of prejudgment interest starts to accrue. It is noteworthy that in Percefull, however, the contract provision at issue provided: "Benefits payable under this Policy for any loss . . . will be paid *immediately* upon receipt of due written proof of such loss." Id. at 389 (emphasis supplied). Thus, pursuant to the contract, payment was due upon notice, and it was in this context that the supreme court in Percefull found that prejudgment interest was due, as the insurer in that case failed to pay benefits when

it received the required proof of loss. Here, the contract also contains a notice provision, and payment was not due until that notice was given.

Applying the foregoing, therefore, the earliest date on which the Agency's entitlement to pre-judgment interest began was the date it demanded return of the unexpended funds Appellant had in its reserves – April 10, 2012. Thus, we reverse the trial court's judgment to the extent it provides for pre-judgment interest payable starting July 1, 2011.

## Conclusion

For the reasons explained above, we affirm the final summary judgment in the Agency's favor and the trial court's order denying Appellant's summary judgment motion, but reverse the final summary judgment to the extent it provides for prejudgment interest commencing July 1, 2011, and remand with instructions to amend the judgment consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.

ROBERTS, C.J., and RAY, J., CONCUR.